IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DARLENE R. ROACH, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 1:16-cv-00085-RGA |
| | : | |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security, | : | |
| Defendant. | : | |

Oderah C. Nwaeze, Esq., Wilmington, DE, Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, Wilmington, DE; Dina White Griffin, Special Assistant United States Attorney, Philadelphia, PA, Attorneys for Defendant.

MEMORANDUM OPINION

February 24, 2017

*Richard G. Andrews*
ANDREWS, U.S. DISTRICT JUDGE:

Plaintiff Darlene R. Roach appeals the decision of Defendant Carolyn W. Colvin, the

Acting Commissioner of Social Security, denying her application for Social Security Disability

Benefits ("SSD") under Section 216(i) and 223(d) of the Social Security Act, and for

Supplemental Security Income ("SSI") under Section 1614(a)(3)(A) of the Social Security Act.

Pending before the Court are the parties' cross-motions for summary judgment. (D.I. 9, 10, 12,

13). For the reasons set forth below, the Court: (1) grants Plaintiff's motion in part to remand this

matter for a new hearing and decision; (2) denies Plaintiff's request that this Court find her

disabled; (3) denies the Commissioner's motion; and (4) remands this matter to the

Commissioner for a new hearing and decision consistent with this memorandum opinion.

## BACKGROUND

Plaintiff first filed her application for SSD and SSI on January 15, 2010, alleging disability

as of July 2, 2007. (D.I. 1 at ¶ 5, 6). That claim was denied initially and Plaintiff timely requested

a hearing before an Administrative Law Judge ("ALJ"). (D.I. 1 at ¶ 7). After the requested

hearing, the ALJ issued a decision denying benefits. (D.I. 1 at ¶ 9). On October 8, 2013 the

Appeals Council vacated the ALJ's decision and remanded the case for further proceedings. (D.I.

1 at ¶ 11). On remand, the ALJ found that Plaintiff was not entitled to SSD and SSI benefits, and

the Appeals Council denied Plaintiff's request for review. (D.I. 1 at ¶ 13, 15). Plaintiff then filed

an appeal to this Court. Plaintiff was forty years old when she filed for SSI. (D.I. 7 (hereinafter

"Tr.") 51). She completed the twelfth grade, and worked as a cashier, general clerk and a fast food

worker. *Id.* Plaintiff alleges disability due to neck injuries, back injuries, and arthritis. *Id.*

2

**A. Disability Determination Process**

Title XVI of the Social Security Act provides for the payment of disability benefits under the SSI program. 42 U.S.C. § 1382(a). A "disability" is defined for purposes of SSI as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *See* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). A claimant is disabled "only if her physical or mental impairment or impairments are of such severity that she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21–22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform the five-step sequential analysis set forth at 20 C.F.R. § 404.1520. *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner should not review the claim further. 20 C.F.R. § 404.1520(a)(4).

**B. Medical Evidence**

At the onset of her disability, on January 2, 2007 (Tr. 152-53), Plaintiff was thirty-three years old and had a GED. (Tr. 74-75, 109). Plaintiff has relevant work experience as a cashier, a general clerk, and a fast food worker. (Tr. 98, 121). Plaintiff's detailed medical history is contained in the record, but the Court will provide a brief summary of the pertinent evidence.

Plaintiff first began treatment for lower back pain in December 2002 after seeing Dr. Balu, a pain management specialist. (Tr. 494). Plaintiff received posterior lumbar spinal joint

3

steroid block injections and "reported significant pain relief" following the procedure. (Tr. 547). In March 2003, Plaintiff received transforaminal epidural steroid injections and again reported "significant pain relief" following this procedure. (Tr. 543). In June 2003, Dr. Balu performed a lumbar discography and Plaintiff reported a pain level of 6/10. (Tr. 534-35).

In November 2006, Plaintiff presented to Nanticoke Memorial Hospital following a motor vehicle accident. (Tr. 437-38). Plaintiff complained of low back pain and underwent pelvic and lumbar x-rays. (Tr. 440). These exams revealed that there was no acute fracture or dislocation, the pelvic rim and obturator rings were intact, and both hip joints were intact. *Id.* The attending physician notes indicated that Plaintiff appeared to be in mild distress and had painless range of motion in her neck and extremities. She was diagnosed with lumbar strain, told to apply ice and heat, remain active and prescribed Motrin and Vicodin. (Tr. 433-34, 442).

On January 3, 2007, Plaintiff returned to Dr. Balu for low back pain evaluation. (Tr. 482). An examination revealed bilateral paraspinal lumbar spasms, facet loading and decreased range of motion. *Id.* An MRI on January 5, 2007 showed a broad based annular bulge with foraminal narrowing. (Tr. 555-56). Plaintiff continued seeing Dr. Balu between January and June 2007 complaining of increasing back pain. Dr. Balu continued to treat Plaintiff by giving her pain injections, which gave temporary pain relief. (Tr. 475, 481, 507, 511).

In June 2007, Plaintiff was involved in a second motor vehicle accident and went to Nanticoke Memorial Hospital complaining of neck pain. (Tr. 466-67). The attending physician noted that because the accident had minimal force, there was minimal possibility of significant injury. (Tr. 466). Plaintiff underwent an x-ray of her cervical spine, which revealed no fracture or dislocation. (Tr. 467). From June 2007 to December 2007, Plaintiff continued to see Dr. Balu,

4

who opined that her condition was unchanged and could be treated conservatively (Tr. 470-73), but that she was "unable to return to any gainful employment." (Tr. 586).

In February 2008, at an appointment with Dr. Balu, Plaintiff stated that she had worsening pain and right hand numbness. (Tr. 469). An MRI of Plaintiff's cervical and lumbar spine showed no herniation and only mild stenosis. (Tr. 709-10). Dr. Balu recommended conservative care and told Plaintiff to continue taking Vicodin, which she had been taking since 2002. (Tr. 469, 494).

In September 2009, Plaintiff underwent an initial orthopedic evaluation by Dr. Freedman. (Tr. 576). Dr. Freedman noted that, since Plaintiff's last appointment with Dr. Balu in December 2008, she had received no treatment and was only taking Tylenol for her pain. (Tr. 576). Dr. Freedman opined, based on a full examination and x-rays he ordered of Plaintiff's lumbar and cervical spine, that she had a full range of motion, that the seated root test caused some back pain, and that her x-rays were "basically negative." *Id.* In November 2009, Dr. Freedman noted that mild bulging of Plaintiff's lumbar spine was present, but that her reflexes were good, her motor strength was intact and she had a negative seated root test. He recommended continuing her conservative treatment plan and in December prescribed her a home cervical traction unit. (Tr. 572-74).

In April 2010, Plaintiff had x-rays, which indicated that her sacroiliac joints were intact with normal bone mineralization. (Tr. 600). Plaintiff returned to Dr. Balu in June 2010 after complaining of back pain. (Tr. 686). Dr. Balu performed a posterior lumbar joint radiofluoroscopic steroid block of the bilateral facet joints, which reduced some of Plaintiff's pain. (Tr. 784, 791). In August 2010, Dr. Balu completed a Spinal Impairment Questionnaire and reported treating Plaintiff for facet pain and radiculopathy in the cervical and lumbar spine. (Tr.

5

591). Dr. Balu stated that his findings were based on clinical and laboratory tests. Dr. Balu also stated that Plaintiff would be absent from work more than three times a month. (Tr. 596).

In September 2010, Dr. DuShuttle, an orthopedic surgeon, evaluated Plaintiff for low back pain. Dr. DuShuttle stated that Plaintiff had full flexion and extension with some stiffness. He diagnosed Plaintiff with lumbar strain and noted no radioculopathy. (Tr. 832). Plaintiff had follow-up visits with Dr. DuShuttle in October 2010 and November 2010, and there was no significant change in her condition. (Tr. 830-31).

In October 2010, Plaintiff returned to Dr. Balu, who performed another posterior lumbar spinal joint steroid block injection. (Tr. 783). Between June 2010 and April 2011, Plaintiff was consistently treated by Dr. Balu, who described her condition as relatively unchanged with some decrease in her range of motion. (Tr. 723-65). At the beginning of each session, Plaintiff consistently rated her pain between five and seven on a scale of one to ten. By the end of each session, she consistently rated her pain between two and five due to the treatment. (Tr. 641).

In October 2011, Dr. Gonzalez-Cota, a pain management specialist, performed a caudal ESI, which revealed spasms and facet loading. (Tr. 704, 706). In December 2012, Dr. Gonzalez-Cota wrote a letter stating that Plaintiff was a patient of his, and describing her conditions. He noted that Plaintiff had reduced flexion, tenderness, muscle spasm, muscle weakness and reflex changes in both her cervical and lumbar spine radiculopathy. (Tr. 852). Dr. Gonzalez-Cota opined that Plaintiff would likely be absent from work for more than three days a month. *Id.* Dr. Gonzalez-Cota's opinions were based on his treatment of Plaintiff, Plaintiff's medical records, and Dr. Balu's opinions. *Id.*

6

Also in December 2012, Plaintiff saw Dr. Kahn because she was experiencing numbness in her left shoulder and swelling in her left knee. (Tr. 849). Dr. Kahn opined that Plaintiff had normal range of motion, normal strength, and no swelling, tenderness or deformity. (Tr. 850).

In the next year, Plaintiff continued to see Dr. Balu, who opined that Plaintiff's condition remained unchanged. (Tr. 862-64). Dr. Balu added Tizanidine to help ease Plaintiff's muscle pain (Tr. 873) and stopped prescribing Norco because it was no longer as effective. (Tr. 868-69). On January 24, 2014, Plaintiff was given a cane by Dr. Balu, at Plaintiff's request. (Tr. 862).[1] In February 2014, Plaintiff saw Dr. Balu for a follow-up visit. Dr. Balu gave Plaintiff more pain medication; she reported that the "pain is improved with rest, improved with medication(s)." (Tr. 956).[2] Dr. Balu prescribed a home exercise plan and repeated that Plaintiff did not require surgery. (Tr. 964). In March 2014, Dr. Balu completed a spinal impairment questionnaire in which he stated that Plaintiff was diagnosed with lumbago, spondylosis, and spinal stenosis of the lumbar region. (Tr. 936). Dr. Balu opined that Plaintiff would miss work more than three days a month and could not lift or carry any amount of weight. (Tr. 939-40, 941). Dr. Balu's opinions were based on Plaintiff's subjective complaints and on his own observations, but not on any "laboratory or diagnostic" tests. (Tr. 938).

In April 2014, Dr. Kahn completed the multiple impairment questionnaire and stated that Plaintiff suffered from low back pain. (Tr. 948). Dr. Kahn said that Plaintiff had not had any recent testing done, and that her last MRI was "years ago." (Tr. 948-49). Dr. Kahn opined that

[1] The record states, "GIVEN CANE – PATIENT REQUESTING IT." (Tr. 862).
[2] Somewhat contrarily, the record also states, "Patient medications are being refilled for Low Back Pain, and are not helping." (Tr. 956).

7

Plaintiff could carry up to five pounds occasionally and that her symptoms were severe enough
to interfere with her attention and concentration. (Tr. 951, 953).

## C. The ALJ's Decision

The ALJ rejected Plaintiff's claim for SSD and SSI on June 12, 2014, using the five-step
sequential analysis. (Tr. 51-52). At step one the ALJ found that Plaintiff had not engaged in
substantial gainful activity since January 2, 2007, Plaintiff's alleged onset date. (Tr. 53). At step
two, the ALJ concluded that the clinical and diagnostic findings taken in the aggregate indicated
lumbar degenerative disc disease, left knee degenerative joint disease, and right shoulder injury,
which were severe impairments. *Id.* The ALJ concluded that Plaintiff's headaches and cervical
degenerative disc disease were non-severe impairments because there was "minimal clinical
evidence to corroborate or support any finding of significant vocational impact related to these
conditions (Exhibits 13F, 15F, 16F)." *Id.* In the third step, the ALJ concluded that Plaintiff's
impairments were not supported by specific clinical and diagnostic findings equal to any of the
requirements in the listing of impairments. (Tr. 54).

In the fourth step, the ALJ considered all of the Plaintiff's impairments, including her
non-severe impairments, and concluded that Plaintiff was able to perform past relevant work.
The ALJ determined, based on the clinical medical evidence, the vocational hearing expert, and
Plaintiff's residual functional capacity determination, that her impairments did not limit her from
performing light exertional, semiskilled work. Plaintiff's past work as a general clerk was
determined to be light exertional and semiskilled. (Tr. 59).

Finally, and, "[i]n the alternative," (*id.*), in the fifth step, the ALJ concluded that Plaintiff
could perform light work, other than stand and walk for four hours and sit for six hours in an
eight hour work day, push and pull with arms and legs, and work overhead. Based on the

opinions of the treating physicians, the medical experts for the state and the vocational expert, Plaintiff was allowed occasional postural activities but no climbing ladders, ropes, or scaffolds, or concentrated exposures to temperature extremes, vibration, and hazards. (Tr. 54). This determination meant that the Plaintiff could perform work such as a routing clerk, redemption clerk, and document preparer. (Tr. 60). Thus Plaintiff had the capacity to perform some light work and therefore had not been under a disability, as defined by the Social Security Act, since January 2, 2007. *Id.*

## DISCUSSION

### A. Standard of Review

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be

9

disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL
793305, at \*3 (E.D.Pa. July 11, 2001).

The Third Circuit has explained that a "single piece of evidence will not satisfy the
substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by
countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-
particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really
constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.
1983). Even if the reviewing court would have decided the case differently, it must defer to the
ALJ and affirm the Commissioner's decision if it is supported by substantial evidence. *See
Monsour*, 806 F.2d at 1190-91.

## B. Analysis

Plaintiff makes two arguments in support of her contention that the ALJ's decision
should be reconsidered. (D.I. 10 at 12). First, Plaintiff argues that the ALJ failed to properly
weigh the medical opinions of the treating physicians, and failed to properly determine Plaintiff's
residual functional capacity. *Id.* Second, Plaintiff argues that the ALJ failed to properly evaluate
Plaintiff's credibility. *Id.* at 17.

### 1. The ALJ erred in deciding to give little weight to the medical evidence of Dr. Gonzalez-Cota.

Plaintiff argues that the ALJ erred in giving less weight to the opinions of treating
physicians Dr. Balu, Dr. Gonzalez-Cota, and Dr. Kahn, all of whom found that Plaintiff was
severely impaired and was not capable of gainful employment. This Court finds that the ALJ
properly considered the opinions and medical evidence contained in the record in deciding to

10

grant little weight to the opinions of Dr. Balu and Dr. Kahn, but improperly considered this evidence in deciding to give little weight to the opinion of Dr. Gonzalez-Cota.

The ALJ is the sole adjudicator of how much weight to afford medical opinions as long as the adjudication is based on substantial evidence in the record, including clinical and laboratory diagnostic evidence.

The Third Circuit follows the "treating physician doctrine." *Gonzalez v. Astrue*, 537 F.Supp.2d 644, 659 (D.Del. 2008); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993). This means that the ALJ must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the claimant only once or not at all. *See Mason*, 994 F.2d at 1067. When a physician has treated a patient over an extended period of time, that physician's opinion should typically be afforded great weight. *See Dass v. Barnhart*, 386 F.Supp.2d 568, 576 (D.Del. 2005). A treating physician's opinion is then afforded "'controlling weight'" if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence [in the claimant's] case record.'" *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (quoting 20 C.F.R. § 404.1527(d)(2)). A final disability determination must not conflict with an opinion deserving of controlling weight.

An ALJ may reject a treating physician's opinion "only on the basis of contradictory medical evidence . . . ." *Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000). That opinion may not be rejected without reason or for the wrong reason. *See id.* at 317. When there is contradictory medical evidence, the ALJ must carefully evaluate how much weight to give the treating physician's opinion and provide an explanation as to why the opinion is not given controlling weight. *See Gonzalez*, 537 F.Supp.2d at 660.

11

Thus, even when the treating source opinion is not given controlling weight, it does not follow that it deserves no weight; the ALJ must apply several factors in deciding how much weight to assign it. *See id.* These include the treatment relationship, the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion offered by the medical evidence, consistency of the opinion with the record as a whole, and specialization of the treating physician. *See id.* If an ALJ fails to conduct this analysis, a reviewing court cannot judge whether the ALJ actually considered all the relevant evidence, and the ALJ's decision cannot stand. *Id.*

Plaintiff argues that the ALJ's findings were conclusory and that Dr. Balu stated that his opinions were based on evidence of decreased range of motion, tenderness, muscle spasm, reflex changes, and muscle weakness in the cervical and lumbar spine as well as MRI findings. (D.I. 10 at 14). Here, however, the ALJ could properly assign little weight to Dr. Balu's opinions because Dr. Balu's assessed functional limitations were inconsistent with the level of impairment suggested by the diagnostic test results, Plaintiff's course of treatment, and Plaintiff's own subjective complaints. (Tr. 56-58). Dr. Balu suggested that Plaintiff suffered from severe back pain, which would preclude her from being able to work. The results from Plaintiff's diagnostic tests do not show a condition that would explain back pain, and there are no laboratory or diagnostic tests in the record to support this diagnosis. (Tr. 593 [August 2010 evaluation citing "MRIs"], 938 [March 2014 evaluation citing nothing]). The clinical exams that Plaintiff did undergo around the time of her injuries, in February 2007, include cervical, lumbar, and pelvic x-rays, and a lumbar and cervical MRI. The x-rays showed no fracture or dislocation (Tr. 440, 467), the lumbar MRI showed no significant stenosis (Tr. 556), and the cervical MRI showed only mild stenosis and no disc herniation. (Tr. 550). At the time of the injury, Plaintiff's treating

12

physicians also stated that Plaintiff suffered only a lumbar strain and experienced no significant distress. (Tr. 433-34). One year later, in February 2008, Plaintiff again had a cervical and lumbar MRI taken, which showed no herniation and no significant stenosis. (Tr. 709-10). Plaintiff's MRIs from October 2009 indicate only mild bulging, and her x-rays from September 2009 were "basically negative." (Tr. 571, 576). Dr. Balu chose not to order new testing, and his opinion that Plaintiff's impairments restricted her functional capacity is inconsistent with these clinical results.

Dr. Balu's treatment plan for Plaintiff is also inconsistent with his final opinion. Dr. Balu described Plaintiff's pain as "nagging and dull." (Tr. 593). He recommended conservative treatment and medication for her back pain, because the medication had controlled the pain for nearly ten years, and because Plaintiff often reported 40% pain relief from the treatment. (Tr. 425-31, 861-62). This treatment plan is inconsistent with Dr. Balu's ultimate conclusion.

Finally, as part of Dr. Balu's treatment plan, Plaintiff was instructed to perform range of motion and flexibility exercises of varying difficulty. (Tr. 956-62). These exercises and conditioning routines seem to be inconsistent with Dr. Balu's contention that Plaintiff has extremely limited functional capacity and would be unable to perform light work. Because of these inconsistencies, the ALJ had a substantial basis for her decision to give little weight to Dr. Balu's opinions.

Plaintiff next argues that the ALJ erred in giving little weight to Dr. Kahn's opinion because he cited to pain management treatment records and an MRI in support of his medical opinion. (D.I. 10 at 14). The ALJ, however, gave little weight to Dr. Kahn's opinion from April 2014, because Dr. Kahn did not cite to the most recent findings to support his opinions, and because other medical evidence was inconsistent with his opinions. Dr. Kahn opined that

13

Plaintiff would have extreme limitations on sitting and standing because of her condition. (Tr. 58). In coming to this conclusion, Dr. Kahn cited clinical exams such as x-rays and MRIs. The clinical exam that Dr. Kahn cited, however, was described as "MRI of back 'years ago'" (Tr. 949), and more recent x-rays and MRIs suggest that Plaintiff had no herniation and no significant stenosis. (Tr. 550-56 [MRIs in January and February 2007], 709-10 [Feb. 2008 MRIs of lumbar and cervical spine showing mild stenosis or no stenosis]). The treatment records of Dr. Kahn in December 2012 show that Plaintiff had "normal range of motion, normal strength, no tenderness, no swelling, no deformity." (Tr. 850). These treatment records are inconsistent with Dr. Kahn's ultimate conclusion and thus the ALJ had a substantial basis for her decision to give little weight to his opinion.

Plaintiff also argues that the ALJ erred in not properly weighing Dr. Gonzalez-Cota's opinion. Plaintiff contends that because Dr. Gonzalez-Cota based his opinions on evidence from his own observations, including a straight leg raise test, and on the medical opinions of Dr. Balu, they are entitled to "controlling" weight. (D.I. 10 at 14, 15-16). Plaintiff is correct in at least the first of these assertions. The ALJ found that Dr. Gonzalez-Cota's opinion limiting Plaintiff "to two hours of sitting and two hours of standing or walking during the span of an eight hour day" was not supported by objective findings. (Tr. 57-58; *see* Tr. 852). However, when concluding that Plaintiff had tenderness, muscle spasm, reflex changes, and muscle weakness in the upper and lower extremities, Dr. Gonzalez-Cota referred to "clinical examinations [that had] been positive for reduced cervical and lumbar flexion" and to the straight leg raise tests. (Tr. 852). Dr. Gonzalez-Cota sufficiently supported his determination that Plaintiff's "ability to do postural activities such as pushing, pulling, bending, kneeling, and stooping" had been completely eliminated. (Tr. 852). The ALJ only partially accounted for Dr. Gonzalez-Cota's opinion in the

14

RFC, as the RFC restricts pushing and pulling with arms and legs but only limits Plaintiff to six hours of sitting and four hours of standing or walking in an eight hour day. (Tr. 54). Because Dr. Gonzalez-Cota's opinion was supported by objective medical evidence in the record, the ALJ did not offer a sufficient reason for giving it little weight and thus did not follow the treating physician rule.

A treating physician's opinion is entitled to controlling weight only when it is supported by objective medical evidence. Here, there are inconsistencies in Dr. Balu's and Dr. Kahn's opinions and the clinical and diagnostic evidence that is in the record. However, Dr. Gonzalez-Cota's opinion is supported by objective medical evidence and therefore deserves controlling weight. The ALJ had a substantial basis for her decision to give little weight to the opinions of Dr. Balu and Dr. Kahn, but her determination with regards to Dr. Gonzalez-Cota's opinion was not based on substantial evidence.

### 2. There is substantial evidence to support the ALJ's evaluation of Plaintiff's subjective statements.

Plaintiff argues that there is a lack of substantial evidence to support the ALJ's evaluation that Plaintiff's subjective statements were "not entirely credible." (D.I. 10 at 18). The ALJ must look to Plaintiff's treatment history, medication, work history, and daily activities when assessing whether Plaintiff's statements were credible. The ALJ properly considered these factors, and therefore there was substantial evidence to support her decision that Plaintiff's subjective statements were unsupported by the medical evidence in the record.

In assessing Plaintiff's subjective complaints, the ALJ first must determine if Plaintiff provided medical evidence showing that a medical impairment could reasonably produce the symptoms that she has. 20 C.F.R. §§ 404.1529(b), 416.929(b). Next, the ALJ must assess the

15

credibility of the subjective complaints using factors such as treatment history, medications, work history and daily activities. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

Plaintiff argued that the ALJ relied on boilerplate language and erred by criticizing Plaintiff's medical treatment.[3] (D.I. 10 at 18). The ALJ may have recited boilerplate language (Tr. 55), but that does not mean her conclusions were not based on substantial evidence. The ALJ looked at the relevant factors and applied them to the specific facts of Plaintiff's case. The ALJ found that Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements about the severity of the symptoms were exaggerated. In coming to this decision, the ALJ noted that the clinical and diagnostic tests showed mild problems rather than severe problems, and that Plaintiff's treatment program reflected this by not requiring surgery and continuing with a conservative approach. (Tr. 56). Treating physicians also concluded that the moderate medications and treatment programs greatly reduced Plaintiff's pain. *Id.* Plaintiff argues that, just because medication helped reduce pain, it does not follow that Plaintiff is able to work. (D.I. 10 at 18). Plaintiff is correct that a reduction of pain does not automatically mean that she is capable of working, but it is a factor that goes towards a capacity to work. If Plaintiff is in less pain, then logically, she would have less of an argument that she is not able to work, because her pain level is one of the things that she claims precludes her from working.

The ALJ further noted that although Plaintiff used a cane, there was no documented need for the cane. Plaintiff herself requested the cane rather than a doctor prescribing one. *Id.* The ALJ noted that Plaintiff did not seem to need or use the cane during the hearing, and the cane

---

[3] I do not understand Plaintiff's argument, which is not developed, that the ALJ criticized her medical treatment.

never once touched the floor. (Tr. 55). Plaintiff argues that the ALJ erred in using this to
determine that Plaintiff's subjective complaints were not credible because she was prescribed a
cane, and there is no requirement that a cane only be prescribed if it is required. (D.I. 10 at 19-
20). The ALJ thoroughly reviewed the medical records and had the benefit of seeing Plaintiff
during her testimony at the hearing.  The ALJ considered the entire record in determining that
Plaintiff's subjective complaints were not entirely credible. The ALJ is supposed to look at both
medical evidence and impressions from the hearing in making this determination. Plaintiff's
statements that she is able to do light work around the house, such as make sandwiches, do
simple errands, dust and clean, and drive to the grocery store, could be considered to be
inconsistent with her statement that she is not capable of doing light work. (Tr. 55). Finally, the
ALJ noted that much of Plaintiff's claims were taken into consideration when evaluating
Plaintiff's functional capability and making the RFC. (Tr. 53). For all these reasons, the ALJ
determined based on substantial evidence that the severity of Plaintiff's alleged symptoms was
not credible.

## CONCLUSION

Because the ALJ's determination to give little weight to Dr. Gonzalez-Cota's opinion
was not based on substantial evidence, Plaintiff's motion for summary judgment is granted with
regards to the petition for a new hearing and decision consistent with this memorandum opinion,
and denied with regards to a finding by this Court that she is disabled.

An appropriate order will be entered.

17